[Civ. No. 1644. Fourth Appellate District.—January 21, 1937.]

KIMIKO SHIMBORI, Respondent, v. C. M. COELHO, Appellant.

Harry C. Westover for Appellant.

Head, Wellington & Jacobs and H. C. Cameron for Respondent.

MARKS, J.—This is an appeal from a judgment in favor of plaintiff in her action brought to recover damages for breach of the terms of a cropping contract.

Under date of January 1, 1935, plaintiff, as lessee, and defendant, as lessor, entered into a written agreement whereby the lessor leased to the lessee, for one year, about fifty acres of land for the purpose of raising lettuce and tomatoes. The lessor reserved the dwelling and other buildings on the land, together with convenient yard space and necessary ground for ingress and egress. Something more than forty acres of the land was planted to orange trees.

No question is raised by either party over those portions of the findings and judgment having to do with the lettuce crop so we will not concern ourselves with that part of the case.

On May 22d, 1935, defendant served on plaintiff a notice of forfeiture of the lease and took possession of the growing tomato crop and excluded plaintiff from the property. This action followed resulting in a judgment in plaintiff's favor in the sum of $2,489.87, after crediting defendant with $212.75 due and unpaid him by plaintiff on account of the lettuce crop.

The evidence discloses that of the forty-five acres to be planted to tomatoes, about thirty-five had been planted when defendant took possession of the property; that the tomato plants were set between the rows of orange trees; that the orange trees occupied about one-third of this acreage; that ten acres were unplanted; that about six of the fifty acres were bare ground. How many of these six acres were included within the ten acres which plaintiff did not plant is not disclosed. Defendant evidently cared for, harvested and marketed the tomatoes planted on the thirty-five acres. It does not appear what was done with the ten acres.

The measure of damages in cases of this kind is fixed by section 3300 of the Civil Code as " . . . the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom". In the case of an action to recover damages for loss of profits from crops, caused by the breach of a cropping contract and the eviction of the lessee, the rule announced in this section has been applied as follows:

"If he was entitled to a recovery as for profit on crops, that profit would mean net profit, to produce which there should be deducted as a charge against the plaintiff all sums ex-

pended in the production or attempted production of the same, including rental and the reasonable cost of bringing the crops to maturity and marketing them.'' (*McCready* v. *Bullis,* 59 Cal. App. 286, at 292 [210 Pac. 638].) (See, also, *Wendt* v. *Smith,* 50 Cal. App. 233 [194 Pac. 736]; *Wells* v. *B. F. Porter Estate,* 205 Cal. 776 [272 Pac. 1039].)

The lease contains the following pertinent provisions:

''During this said term, approximately forty-five (45) acres of said leased premises shall be planted in tomatos; the Lessor shall do all necessary plowing, discing and other work necessary to prepare the ground for the planting of the tomatos; the Lessee shall attend to the planting of the tomatos and caring for the same, including cultivating, irrigating and other work, and the Lessee shall harvest said tomatos at proper times, prepare the same for market and attend to marketing the tomatos. If it becomes necessary to spray the tomato plants, the Lessor and the Lessee shall pay in equal shares the expense of said spraying. The Lessor shall furnish, free of cost to the Lessee, water from the aforesaid well and pumping plant for irrigating the said tomatos, but shall not be liable because of any failure of water from said well, through no fault of the Lessor. One-half of all of said crop of tomatoes at all times shall be and remain the property of the Lessor, and the remaining half thereof, the property of the Lessee. On the sale of the tomatos the proceeds therefrom shall be divided equally between the parties hereto.''

From the foregoing it is evident that the parties defined the obligations each was to perform under the contract. The defendant, the lessor, was to prepare the ground for the planting, pay half the cost of any necessary spraying, and furnish the water for irrigation. Plaintiff, the lessee, was to plant the tomatoes, care for the same, harvest and prepare them for market and attend to marketing them. It is reasonable to conclude that each party would pay the entire cost of performing his obligations under the contract and no part of the cost of the performance of the other party's obligations. While the plaintiff was required to attend to marketing the crop, that in itself would not include the paying of any of the expenses of the marketing which were composed of a hauling cost of five cents a box, for those hauled to Los Angeles, and a ten per cent brokerage for the selling there. The fact

that the contract specified the obligations to be performed by each of the parties, up to the time of preparing the tomatoes for market and attending to the marketing of them, the provision that the tomatoes should belong, one-half to each, and that the proceeds from their sale would be divided equally, would indicate that each party should pay his half of the cost of the hauling and of the brokerage. There would be no brokerage on tomatoes sold to a cannery. Plaintiff contemplated selling a percentage of the crop as "green tomatoes" for which there would be no hauling charge and perhaps no brokerage.

The trial judge concluded that the cost of the tomato plants, $318.75, as well as the cost of fertilizer, $186.50, should be paid, one-half by each party. He admitted expert evidence on the probable yield and grades to be expected and the costs of marketing. He also admitted evidence of market prices for different dates during the probable marketing season. These varied greatly from day to day and varied also as to grade, size, and whether the tomatoes would be delivered to the market, sold green at the place of production, or sold to a cannery.

The evidence on the reasonable market prices of the tomatoes is most unsatisfactory. The principal witness for plaintiff, her father, testified that the expected yield should have been three hundred fifty boxes, plus two tons for cannery purposes, per acre; that of the three hundred fifty boxes per acre there should have been ninety per cent number one, and ten per cent number two, grades; that picking on the thirty-five acres should have started about July 1st, and should have ended about August 31st; that the price of the number ones opened at about two dollars per box July 1st, and ended at about thirty-five cents a box on August 31st; that when the number ones were two dollars a box, number twos were a dollar and a quarter a box, and that when number ones were thirty-five cents, number twos were fifteen or twenty cents a box. The prices on both grades varied daily and also varied according to size. No estimate was given either of the daily pick to be expected nor of the sizes.

This witness, during the season in question, raised and sold tomatoes from land in the general location of the leased land. He was asked concerning the prices he had received for his number one grade tomatoes on three respective dates and testified as follows:

July 10th: "Five by five pink, five boxes $1.25 each; six by six ripe, three boxes $1.00 each; four by five, two boxes 90c; five by five, three boxes $1.00 each; five by five pink, four boxes, $1.00 each; six by six ripe, four boxes, 80c each; six by six pink, three boxes, 80c each. . . . August 1st: Six by six ripe, ten boxes, 50c each; six by six pink, fifteen boxes, 50c each; five by five pink, twenty-three boxes, 90c each; five by five ripe, thirty boxes, 90c each; four by five, nine boxes, 70c each; four by five ripe, five boxes, 70c each. . . . August 15th: Four by four ripe, four boxes, 50c each; four by five, seventeen boxes, 55c each; four by five pink, ten boxes, 65c each; five by five, thirty-six boxes, 70c each; five by five pink, twenty boxes, 75c each; six by six ripe, fourteen boxes, 40c each; six by six pink, four boxes, 40c each; two tier, twenty boxes, 40c each; fourteen boxes, 45c each."

This evidence shows that he sold twenty-four boxes on July 10th, 92 boxes on August 1st, and 133 boxes on August 15th. It is apparent that as the season advanced and the yield of tomatoes increased, the price decreased, and that the daily price varied materially, depending upon the size of the tomatoes. Without some evidence on the daily yield and sizes to have been expected, and the daily prices to have been expected for such sizes, which facts do not appear in the record, the estimate of money which might have been received for the crop was at best an unsatisfactory guess.

■ The trial judge excluded all evidence of the cost which would have accrued to plaintiff in raising the crop of tomatoes had the lease not been terminated. This was error as she was entitled to recover, if at all, only the net profits which she might have expected had she been permitted to fulfill her contract. Under such circumstances, and under the plain terms of her contract, she would have been compelled to pay the costs of planting, caring for, harvesting and preparing the tomatoes for market. These costs should have been ascertained and should have been deducted from the selling price of her share of the tomatoes. As was said in *Wendt* v. *Smith, supra:*

"But the appellant's objection as to the insufficiency of the evidence is well taken. The record before us is lacking in evidence upon important facts which should properly enter into an estimate of damages in an action of this nature.

"It is claimed by appellant and tacitly admitted by respondents that there is no evidence of the probable cost of raising and harvesting the crops upon the land. Respondents seek to overcome this defect in the evidence by the argument that the jury was composed of ranchers from the vicinity who were probably aware of the cost of producing these products. But vital evidence may not be supplied in this irregular and uncertain manner. The only testimony on this subject is the indefinite statement of the appellant that he did not know the amount of expense incurred by those who completed the respondents' work in raising and harvesting the crop of 1918, but he knew there was some expense incurred in connection therewith. Evidence upon this subject should have been before the jury, as, under the lease, respondents were entitled to one-half the crops less the labor expended."

■ Defendant attempted to prove that he took care of the tomatoes, sold the crop, the quantity and quality of the tomatoes sold and the returns which he received. This evidence was erroneously excluded. Assuming that defendant could have produced evidence that he took care of the tomatoes in a good and farmerlike manner and sold them at the prevailing market price, this proffered evidence would have been competent to show the quantity, grade and size of the tomatoes produced from the leased land and the prices received for them. While this evidence should have been admitted, the weight to be given to it should have been determined by the trier of fact.

■ The trial judge in summing up the case and in announcing the items of damage of which the judgment is composed, charged defendant with one-half the cost of the tomato plants, the fertilizer, and the picking and packing of the tomatoes. Under plaintiff's contract this last item is clearly an expense chargeable to her. The lease specifically provided the work to be done and the expense to be paid by defendant and these did not include any cost of the plants or the fertilizer. No part of these costs should have been charged to defendant. These charges, which appear in the summation of the evidence by the trial judge, are not specifically reflected in the findings, which are most general, and, therefore, this might not furnish a ground for a reversal of the judgment if no other errors existed. As the case must be tried

again we mention them here so that these errors may not be repeated.

Judgment reversed.

Barnard, P. J., and Jennings, J., concurred.